Donna V. ZABRISKIE,
Plaintiff-Appellee,

v.

Reed D. LEWIS and William J. Rogers, Jr., Defendants-Appellants.

No. 74–1015.

United States Court of Appeals, Tenth Circuit.

Argued Aug. 22, 1974.

Decided Dec. 5, 1974.

548

M. Richard Walker, Salt Lake City, Utah, for defendants-appellants.

Leonard W. Burningham, Salt Lake City, Utah, for plaintiff-appellee.

Before HILL, SETH and McWILLIAMS, Circuit Judges.

HILL, Circuit Judge.

This appeal stems from a judgment against defendants-appellants in which jurisdiction was based on 15 U.S.C. § 78aa and pendent jurisdiction. Liability was predicated on violations of 17 C.F.R. § 240.10b–5 (Rule 10b–5) and Utah Code Ann. § 61–1–1 (1968).

Appellee Donna Zabriskie (now Beaman) engaged appellant Lewis to locate investment properties for her. Lewis was a real estate agent for Max Ingalls & Associates, Realtors. Appellant Rogers, broker for the firm and Lewis' immediate supervisor, requested that Lewis bring appellee into Rogers' office to allow Rogers to present to the appellee a proposal for loaning funds to one John Worthen. Lewis called appellee to set up the meeting; on February 1, 1971, Lewis transported appellee to Rogers' office. The proposal was that appellee loan $15,000 to Worthen and in exchange she would receive a promissory note signed by Worthen for $17,250 including interest paid to April 1, 1971 (maturity was April 1 with an optional demand date of March 2 and a $16,500 payoff). For security, appellee would be given a stock certificate of 1,000,000 shares of Computer Parking Systems, Inc. (hereinafter Computer) issued to Albert P. Folsom, allegedly president of Computer, and a hypothecation agreement covering the shares. Appellee testified that Rogers told her the shares were worth approximately $100,000, that she was told the shares were negotiable, that Lewis told her Worthen was almost a genius and a good man to whom she could entrust her money, and that Rogers told her the funds were to be used to promote Dax Corporation (hereinafter Dax) ". . . which was to be one of the greatest stock developments that he had ever heard of. . . ." Appellee accepted the proposal. Lewis drove appellee to a bank where she obtained a $15,000 cashier's check and then transported her back to the office where she gave the check to Worthen and received the note, stock certificate, and hypothecation agreement.

Lewis subsequently contacted appellee to arrange a second meeting for February 10. Rogers, Lewis and Worthen were present at this meeting.[1] Appellee gave Worthen an additional $7,000 and received an $8400 promissory note from J.E.W. Inc., Worthen's closely-held corporation. The note, payable on or before April 10, 1971, was secured by the assignment of another note in the amount of $12,500 issued by Pacific Flight Support, Inc. (hereinafter called Pacific Flight) to J.E.W. Inc. Appellee testified that she was told the money was needed to promote Dax and that Rogers and Worthen said the Pacific Flight note was valuable.

On March 1, 1971, Rogers and Lewis obtained two drafts of $15,000 and $1,500 and delivered them to appellee at her home.[2] Appellee retained the $1,500 draft as interest and returned the $15,000 draft to the two men. Appellee testified Rogers and Lewis told her this reinvestment was needed for thirty days for Dax's purposes.

The obligations were not paid in full when due; however, appellee did receive a total of $3,500. In July or August,

---

1. Appellee testified Gordon A. Wilson, a real estate agent for Max Ingalls & Associates, was present at this meeting but apparently the trial court did not find Wilson was present at any of the transactions.

2. Appellee again testified that Wilson was present but made no statements.

1971, appellee received a warranty deed with Lewis as grantee and a special warranty deed with herself as grantee. These deeds covered 100 lots in Texas. In August appellee purchased shares of Dax and paid $1,382.50 for them. Appellee testified Lewis told her Dax was a very good investment.

Appellee hired an attorney to recover her funds. The efforts to realize money on the collateral were unsuccessful. The Computer stock was nonnegotiable; Pacific Flight could not be contacted and appellee testified, as of the trial date, the company was no longer in operation; appellee's attorney was unsuccessful in ascertaining the value of the Texas property.[3] Appellee testified Lewis discouraged her from contacting the Securities and Exchange Commission (SEC) about transferring the Computer stock because he did not want Dax investigated until it was promoted further; however, appellee contacted the SEC and was unsuccessful in her transfer attempt.

On September 5, 1972, appellee filed an action in the United States District Court for the District of Utah. Appellee's four basic claims, as distilled in the pretrial order, were (1) a violation of § 10(b) of the Securities & Exchange Act of 1934, in that the defendants fraudulently induced the plaintiff to loan money to J.E.W. Inc., through misrepresentations, and as a result of a scheme and artifices to defraud, and through practices which did operate as a fraud and deceit upon the plaintiff, (2) substantially the same allegation under Title 61 of the Utah Code Annotated;[4] (3) common law fraud in that defendants made substantial misrepresentations, and (4) a claim under the terms and provisions of a secured note.

Following a trial to the court, judgment was entered for appellee against Rogers and Lewis, jointly and severally, in the amount of $26,373.39, including $3,500 attorneys fees.[5]

The court concluded "[t]he acts, practices, scheme, course of business, false and misleading statements and omissions, and artifice to defraud perpetrated by the defendants on the plaintiff . . ." violated Rule 10b–5 and Utah Code Ann. § 61–1–1. An order granting sale of the collateral and awarding judgment of any deficiency after sale was made.

Appellants attack the trial court's determination initially on two legal grounds: (1) the promissory note[6] involved here is not a *security* and (2) even if the promissory note is a security, no purchase or sale occurred.

These challenges attack both the court's jurisdiction and the existence of a prima facie case.

It is, of course, the law that the burden is upon the plaintiff to establish jurisdiction, and coincidentally make

---

**3.** The petition alleged several defendants had represented to appellee that a $4,000 M.I.A. appraisal, which appellee would have to pay for, was necessary before defendants could sell any of the lots.

**4.** Utah Code Ann. § 61–1–1 provides:

It is unlawful for any person, in connection with the offer, sale, or purchase of any security, directly or indirectly

(1) to employ any device, scheme, or artifice to defraud,

(2) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, or

(3) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

**5.** The action was originally filed against J.E.W. Inc., Dax Corporation, John E. Worthen, Michael F. Steed, Reed Lewis, William Rogers, Jr., Gordon A. Wilson, Albert P. Folsom and John Does 1, 2, 3, 4, and 5.

The case was dismissed as to Dax Corporation on October 15, 1973, as to Gordon Wilson on October 3, 1973, and as to Michael Steed on September 20, 1973. Default judgment was granted against Albert P. Folsom. Judgment was entered by stipulation against J.E.W. Inc. and John E. Worthen.

**6.** Appellants do not use the term *note* in the plural so it is uncertain if they attack the determination of all notes involved herein. We, however, have treated their allegation as encompassing the promissory notes made by Worthen and J.E.W. Inc.

out a case under the statute and rule [15 U.S.C. § 78j and Rule 10b–5], and to do so he must prove: (1) Use of the mails or instrumentalities of interstate commerce; (2) the *purchase or sale* of a *security*; and (3) the use of a manipulative or deceptive device [Emphasis added]. Stevens v. Vowell, 343 F.2d 374, 378 (10th Cir. 1965).

■■ Title 15 U.S.C. § 77b(1) (Securities Act) defines *security* as including "any note . . . [or] evidence of indebtedness . . . ." [7] Title 15 U.S.C. § 78c(a)(10) (Securities Exchange Act) defines *security* as "any note . . . but shall not include . . . any note . . . which has a maturity at the time of issuance of not exceeding nine months . . . ." These definitions of *security* have been held to be virtually identical. Tcherepnin v. Knight, 389 U.S. 332, 88 S.Ct. 548, 19 L.Ed.2d 564 (1967). Appellants argue the notes in question are not securities because of the maturity date exception. Although the stated maturities of these notes would appear to place them within the statutory exclusion, that exception is not applicable to the type of notes involved here. Numerous courts, interpreting that exception, have agreed with the Securities Exchange Commission (Securities Act Rel. No. 4412, 26 Fed.Reg. 9158 (1961)) and limited that exception to ". . . only . . . prime quality negotiable [commercial] paper of a type not ordinarily purchased by the general public, that is, paper used to facilitate well recognized types of current operational business requirements and of a type eligible for discounting by Federal Reserve banks." Bellah v. First Nat'l Bank, 495 F.2d 1109 (5th Cir. 1974); Zeller v. Bogue Elec. Mfg. Corp., 476 F.2d 795 (2d Cir. 1973), cert. den'd 414 U.S. 908, 94 S.Ct. 217, 38 L.Ed.2d 146; Sanders v. John Nuveen & Co., 463 F.2d 1075 (7th Cir. 1972), cert. den'd, 409 U.S. 1009, 93 S.Ct. 443, 34 L.Ed.2d 302; Anderson v. Francis I. duPont & Co., 291 F.Supp. 705 (D.Minn.

1968). The notes involved here certainly were not prime quality negotiable commercial paper.

■ A more difficult question is raised by appellants' assertion that these notes are not within the definition of *security* because they are not the type of notes Congress intended federal securities law to regulate. Appellee admits that not all notes are meant to be reached by the federal securities law. Although this statement seems to be contrary to the clear language "any note", the "unless the context otherwise requires" language of 15 U.S.C. §§ 77b and 78c(a) and the Supreme Court's indication that we are dealing with a flexible concept, SEC v. W. J. Howey Co., 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946), have been held to compel limitation concerning notes to be considered within the definition. *But see* Sanders v. John Nuveen & Co., *supra* at 1078. Thus, not all notes are included within the protection of the anti-fraud provisions. McClure v. First Nat'l Bank, 497 F.2d 490 (5th Cir. 1974); Lino v. City Investing Co., 487 F.2d 689 (3d Cir. 1973); Zeller v. Bogue Elec. Mfg. Co., *supra* at 800.

■ This Circuit has not determined what tests should be applied in determining which notes come within the definition of *security*. The Supreme Court in dealing with an investment contract said of the definition of *security* that it embodied

a flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits. SEC v. W. J. Howey Co., *supra*.

This Court has stated

[w]hether a particular investment constitutes a security depends upon the facts and circumstances of the case. . . . Substance is exalted over

---

7. 15 U.S.C. § 77c(a)(3) exempts "[a]ny note . . . which arises out of a current transaction or the proceeds of which have been or are to be used for current transactions, and which has a maturity at the time of issuance of not exceeding nine months . . . ." from the provisions of this subchapter.

form and emphasis is placed on economic reality. Vincent v. Moench, 473 F.2d 430 (10th Cir. 1973).

At least three circuits have adopted a test placing those notes of commercial character outside the definition of *security* and those notes of investment character within the definition. McClure v. First Nat'l Bank, *supra*; Lino v. City Investing Co., *supra*; Zeller v. Bogue Elec. Mfg. Co., *supra*. This test is based on the purpose of the Act to protect investors, the "unless the context otherwise requires" language, and the practical considerations of subjecting commercial notes to the registration provisions of the Securities Act as well as fear of the resulting litigation flooding the federal courts if commercial notes were included. The test accords with the exalting of economic reality over form, Vincent v. Moench, *supra*, and seeks to protect investors, Associated Sec. Corp. v. SEC, 293 F.2d 738 (10th Cir. 1961).

In *Sanders, supra* at 1080, the Seventh Circuit stated that court's view of the distinction between the two kinds of notes.

> When a prospective borrower approaches a bank for a loan and gives his note in consideration for it, the bank has purchased commercial paper. But a person who seeks to invest his money and receives a note in return for it has not purchased commercial paper in the usual sense. He has purchased a security investment.

■■ Clearly, if the proceeds of a note are used to purchase consumer goods or services, the note has a commercial character. Lino v. City Investing Co., *supra*; Joseph v. Norman's Health Club, Inc., 336 F.Supp. 307 (E.D. Mo.1971). The proceeds in this present situation were not for a consumer pur-

pose but rather were to be used to promote Dax. Thus the proceeds were to be used for a business purpose; the fact proceeds are to be used for a business purpose, however, does not mean an investment note is involved. *See* Bellah v. First Nat'l Bank, *supra*. The *Bellah* and *McClure* cases involved loan transactions within normal commercial circles and "business purpose" notes were held to have a commercial character.

■■ Making the distinction between commercial and investment notes when proceeds are to be used for a business purpose is often difficult. A test suggested by one commentator is ". . . whether the transaction is of the kind in which stock often actually *is* given."[8] This test seeks to prevent circumvention of the anti-fraud provisions and allows consideration of the particular facts and circumstances of each case. In the instant case, appellee testified that she was told at both the February 1 and February 10 meetings that the funds were to be used for the promotion of Dax. Appellee, an unsophisticated investor, was promised a return of about 120% on her money. She had been seeking investment properties and had secured Reed's assistance in locating an investment for her. These were isolated transactions outside normal commercial circles. *Compare* McClure v. First Nat'l Bank, *supra*. Promotion of a corporation is a function for which stock often actually is given; in fact, this is a primary reason for stock issuance. Appellee was not in the business of making loans; she was not receiving any consumer goods or services; she made an investment and received promissory notes. Although other factors often indicia of a security are missing,[9] the promissory notes here

---

**8.** Comment, Commercial Notes and Definition of "Security" Under Securities Exchange Act of 1934: A Note is a Note is a Note?, 52 Neb.L.Rev. 478, 501 (1972–73).

**9.** *Id.* at 511–523. The author suggests factors which could assist in the final determination that an investment note (a security) is or is not present. These include: (1) use of proceeds to buy specific assets or services (commercial) rather than general financing (investment), (2) risk to initial investment, (3) giving certain rights to a payee (investment), (4) repayment contingent on profit or out of production (investment), (5) a large number of notes or payees (investment), (6) a large dollar amount (investment), (7) fixed time notes (equivocal) rather than demand notes (commercial), and (8) characterization by the parties themselves.

were given to obtain funds to promote a corporation and applying the aforementioned test are securities within Rule 10b–5.[10] *See* SEC v. Addison, 194 F.Supp. 709 (N.D.Tex.1961) (there a court held promissory notes were securities when defendants needed money to get into operation and financed such operations by soliciting unconditional unsecured loans).

■ Appellants argue that no *sale* of a security has occurred here and rely principally on McClure v. First Nat'l Bank, 352 F.Supp. 454 (N.D.Tex.1973). That court held that even if the notes involved therein were securities, the transactions would not constitute the "purchase or sale".[11] There the court, however, notes that " . . . the issuance of a note which is the formal equivalent of the issuance of shares of stock would be covered by the Act." *Id.* at 460.

In 15 U.S.C. § 78c(a)(14) *sale* and *sell* are said to "each include any contract to sell or otherwise dispose of." The promissory notes were clearly "disposed of" here and value was given.

Appellants next contend that appellee did not exercise due diligence in the transaction as required by prior decisions of this court. Mitchell v. Texas Gulf Sulphur Co., 446 F.2d 90 (10th Cir. 1971), cert. den'd, 404 U.S. 1004, 92 S.Ct. 564, 30 L.Ed.2d 558, 405 U.S. 918, 92 S.Ct. 943, 30 L.Ed.2d 788 (1972); Gilbert v. Nixon, 429 F.2d 348 (10th Cir. 1970).

Specifically they argue the issuer's restriction on the transfer of the Computer stock was noted conspicuously on the face of the stock certificate and thus clearly gave notice that the stock was not negotiable.[12] The trial court found Lewis and Rogers

. . . made false and misleading statements to the plaintiff concerning the value of said shares of capital stock, the negotiability of said shares of capital stock, the security of the plaintiff's investment, and failed to disclose to the plaintiff that said shares of capital stock were unregistered shares, and that they could not be sold except in accordance with the Securities Act of 1933, as amended.

. . .

The trial court, believing appellee's testimony, also determined that she was an unsophisticated investor.

■ Concerning appellee's due diligence in the transaction, it should be noted that appellee testified she was told the shares were negotiable. The trial court determined that a false and misleading statement was made concerning the stock's negotiability; there is evidence to support this finding. Lewis had been engaged by appellee to find her suitable investments; Rogers was Lewis' supervisor. Appellee's reliance on the statements of these two men would not seem to indicate a lack of diligence but rather a justifiable reliance. As to her alleged receipt of actual notice from

---

Two other commentators sum up existing law on court decisions in this manner: "Notes issued for personal loans and consumer installment purchases are not securities. Notes that are issued for investments and business acquisitions as well as commercial paper sold outside the normal institutional markets are securities." Martin Lipton & George A. Katz, "Notes" Are (Are Not?) Always Securities—A Review, 29 Bus.Law. 861, 866 (1974).

10. In the district court opinion in McClure v. First Nat'l Bank, 352 F.Supp. 454, 458 (N.D. Tex.1973), the court said those transactions did " . . . not involve a subterfuge for stock transactions where adherence to substance over form would demand coverage by the Act."

11. The issue of a sale of the promissory notes is not addressed in the circuit court opinion of *McClure.* The district court, however, said at 352 F.Supp. 459: " . . . where the transaction complained of is one where the issuance of a note rather than of shares of stock is merely a technical difference in form, . . . there is jurisdiction under the Act."

12. This restriction reads as follows:

"The shares of Stock represented by this certificate are held for investment and not for distribution, and cannot be presented for transfer until compliance with the Securities Act of 1933 as amended."

the legend, the oral statement indicating the stock was negotiable could easily have satisfied any question the legend raised in the mind of this unsophisticated investor.

Appellants present two evidence questions concerning the trial court's exclusion of evidence of the Computer stock's value. Edward Bagley, president of a stock brokerage firm, attempted to testify concerning the stock's value based on October 2, 1973, "pink sheets" (quotation sheets prepared by the National Daily Quotation Service) and calls he made to a few "market makers". The pink sheet testimony was excluded because (1) it was irrelevant to have evidence of the market in these shares when appellee's shares could not be negotiated and (2) the expert witness had no personal knowledge concerning the pink sheets. The testimony about the phone calls was excluded as hearsay.

Appellants argue that the value of investment stock can be established by expert testimony and the failure to allow the introduction of competent expert testimony pertaining to the present market value of the stock was prejudicial. Although there can be little dispute with appellants' statement as to the general appropriateness of expert testimony, 31 Am.Jur.2d Expert and Opinion Evidence § 138, it must be remembered that evidence must be relevant.

> The sole test is whether or not the factual information tendered for communication to the fact finder would be helpful in the determination of the factual matter that is in dispute between the parties. 1 Jones on Evidence § 4:1 (6th ed. 1972).

The question here was: Had false and misleading statements been made concerning the value of nonnegotiable Computer stock as of February 1, 1971? Evidence pertaining to the present [October 3, 1973] *market* value of shares of Computer would not seem naturally and logically to establish or negate the fact in issue.[13] It is not error for a court to refuse to admit or take judicial notice of irrelevant evidence.

Appellants also contend appellee did not offer proof of the Computer shares' value, a necessary element to show a false and misleading statement was, in fact, made. This argument relates to only one of the many statements found to have been false and misleading. Due to the statement concerning nonnegotiability, it would seem appellant was at least misled as to the value of this stock and proof of the exact intrinsic value should not be required.

Appellants finally challenge the trial court's determination by arguing that the language of Rule 10b–5 is insufficient to include the participation of Lewis and Rogers.

The trial court, in its findings of facts, stated several events, supported by the record, in which " . . . defendants, Lewis and Rogers, singly, *acting in concert with,* and *aiding and abetting* the defendants, J.E.W. Inc., Worthen and Folsom . . ." violated Rule 10b–5. The words "acting in concert" would indicate a finding of participation of multiple actors and liability is imposed on participants if their participation is substantial. 2 Bromberg, Securities Law: Fraud § 8.5(520) (1973). Aiding and abetting in the violation of Rule 10b–5 is also sufficient for imposition of liability. Kerbs v. Fall River Indus., Inc., 502 F.2d 731 (10th Cir. 1974); Anderson v. Francis I. duPont Co., *supra*; Brennan v. Midwestern United Life Ins. Co., 417 F.2d 147 (7th Cir. 1969), cert. den'd, 397 U.S. 989, 90 S.Ct. 1122, 25 L.Ed.2d 397 (1970). Appellants interpret the trial court's determination as being one of conspiracy and claim that no

---

**13.** The exclusion of evidence of the present fair market value is alleged to have prejudiced appellants because the stock ordered foreclosed was far in excess of appellee's claim against appellants. The trial court provided that " . . . any amount remaining after payment of the foregoing be paid by the United States Marshal to the Clerk of the above entitled Court for the use of the party or parties lawfully authorized to receive the same. . . . "

knowledge on the part of Lewis and Rogers of the scheme is shown by the evidence and that such knowledge is necessary for liability.

▮ When liability is to be imposed on participants, aiders and abettors, and co-conspirators knowing participation in the fraudulent scheme must be shown.

> Some link, then, between the defendants is essential unless vicarious liability is to lie for purely coincidental actions. It does not matter greatly what we call the link: agreement, understanding, combination, concert, mutual authorization, joint action or something else. The need is substantially the same whether we classify the defendants as participants, aider-abettors or conspirators. Certainly no formal agreement is necessary to forge the link and a tacit understanding will suffice.
>
> The link, if not directly proved, may be inferred from parallel or complementary acts, prior relationships, common benefits, interchange of communications or other relevant factors. 2 Bromberg, *supra*, § 8.5(581).

In upholding the imposition of liability on a participant defendant, Senior Judge Durfee, speaking for this Court, said:

> . . . The totality of facts and circumstances herein indicates, as the trial court found, that Thompson was a *knowing participant* in the fraudulent scheme against Kerbs; such participation constitutes conduct proscribed by § 10 and Rule 10b–5, and as such, is sufficient to establish liability under the statute and the rule. [Emphasis added]. Kerbs v. Fall River Indus., Inc., *supra* at 740.

▮ Without recounting all the facts indicating knowing participation, a few of the more important circumstances are (1) Reed and Lewis became officers and/or directors of Dax; (2) Lewis suggested appellee should not contact the SEC to investigate Dax; (3) Rogers and Lewis obtained a finders' fee for the "loan" and did not disclose this to appellee; (4) Lewis and Rogers did not disclose

the nonnegotiable nature of the Computer stock to appellee who had hired Lewis to find suitable investment properties; and (5) Lewis and Rogers made numberous false and misleading statements concerning the collateral securities.

Affirmed.