[No. 4686–1.   Division One.   April 10, 1978.]

RUTH SAUVE, *Respondent,* v. K.C., INC., ET AL,
*Appellants.*

*Steinberg & Steinberg, Jack Steinberg,* and *Robert Kuvara,* for appellants.

*Siderius, Lonergan & Crowley* and *Patrick W. Crowley,* for respondent.

CALLOW, J.—The defendant K.C., Inc., was owned and operated by K.C. Appliance Leasing, and it also had its own retail appliance store. It was in the business of buying new household appliances and then leasing them to householders who would pay it a monthly rental with the option at the end of the lease period to purchase the appliance for about one dollar. The corporation's officers were defendants James O. Flynn, his wife Joyce, and their son Stephen.

The Flynns employed the defendant Donald J. DeHan as a full-time fund raiser, to approach various individuals to borrow money from them in order to finance the corporation's purchase of new appliances. Mr. DeHan approached over 50 persons and succeeded in obtaining loans from about 45 of them in the total amount of at least $250,000. Mr. DeHan was paid a straight commission based upon the amount of money he was able to raise. Neither Mr. DeHan nor any of the Flynns was a licensed or registered security salesman.

One of the persons from whom Mr. DeHan sought to borrow money was the plaintiff, Ruth Sauve. Mrs. Sauve is a 47–year–old widow whose husband was killed in a truck/train accident in 1971. She has one dependent child living with her at home. As a result of her husband's death, she received approximately $21,000 in death benefits. She has little or no experience in business and only completed the sophomore year of high school. During her life she worked 3 months at Woolworth's and 7 1/2 years as a machine operator for an envelope company. Mrs. Sauve had known and trusted Mr. DeHan for about 5 years, since he and his family were friends of her niece, who had loaned some money to defendant corporation. Mr. DeHan represented himself to the plaintiff as an investment counselor.

Mrs. Sauve was interested in the prospect of loaning money to defendant corporation in order to obtain a rate of interest greater than that obtainable from her savings bank. Mr. DeHan informed her that any loan could involve a risk.

On April 16, 1972, the plaintiff loaned the defendant corporation $15,120, through Mr. DeHan, and was given a receipt therefor. She knew that this loan was being made to the corporation, and not to its individual officers or directors, but she mistakenly believed that the Flynns would be personally liable for the loan.

The corporation used the amount of the plaintiff's loan to immediately purchase 84 new appliances which it thereupon leased to householders. At the time of the loan, the corporation gave the plaintiff 84 documents, each representing her security interest in the new appliances purchased with her money. Each was entitled at the top "Security Agreement (Conditional Sale Contract)." The documents were on the same type of printed form; each was dated April 17, 1972, and named the plaintiff as the seller and K.C., Inc., and Joyce E. Flynn as the buyers. Joyce Flynn, who was vice-president of the corporation, acted as a corporate officer and not in her individual capacity. Each document describes a specific appliance, listing both its model number and serial number, together with its cash sales price. Each document contains a box for the listing of the Washington State sales tax, which in each of the documents is listed as "$.00". The balance of the form spreads interest payments over 35 months with a cash out on the 36th month.

The plaintiff was made aware of the fact that in the event the corporation defaulted on the interest payments she could declare the entire principal immediately due, or she could commence proceedings to repossess the appliances. None of the 84 documents was registered as a security. The plaintiff was not aware of any need to have these documents filed with any governmental office, and she did not file them with either the county auditor or the Secretary of State.

For about 2 1/2 years after the loan the corporation sent plaintiff its check for $149 each month, constituting the interest payment called for in the 84 documents. All these checks were honored by the bank except for five which were dishonored. Since the five dishonored checks constituted a default, the plaintiff then demanded immediate repayment of the entire principal balance. Accordingly, in April 1974 the corporation repaid her about half the principal (slightly over $7,400), at which time she returned half of the security documents to the corporation. The corporation failed to pay her the remaining half of the principal, and went into voluntary bankruptcy on January 28, 1976.

Upon this default, the plaintiff did not attempt to repossess the 42 remaining appliances since, had she done so, she would have had to rent a warehouse in which to store them. She instituted this action seeking recovery against both the corporation and all the individual defendants of the remaining principal balance of $7,470, plus interest, attorney's fees, and "consequential damages" of $5,000. In her complaint the plaintiff based her right to recovery against the individual defendants upon the following grounds: (1) breach of contract; (2) common–law fraud; (3) violation of The Securities Act of Washington, RCW 21.20 (which makes it unlawful for an unlicensed salesman to sell unregistered securities); and (4) violation of the Washington unfair business practices act (Consumer Protection Act), RCW 19.86. In their answer the defendants prayed that the complaint be dismissed with prejudice, asserting that the debt was a corporate debt and that the officers, directors and stockholders of the corporation were not liable individually.

Trial to the court resulted in the dismissal of the defendant Stephen Flynn from the action and the entry of judgment in favor of the plaintiff against the defendants James O. Flynn and Joyce Flynn, husband and wife, and Donald J. DeHan and Elizabeth DeHan, husband and wife, together with their marital communities, in the sum of

$6,308, together with $1,500 attorney's fees and taxable costs.

The court found that the defendant K.C., Inc., owed a duty as trustee to the plaintiff to collect on the merchandise from the consumer lessees. Based upon that finding, the court concluded that the arrangement constituted a collateral trust. The trial court characterized the transaction as a 3–party arrangement with the plaintiff furnishing the funds, the defendants furnishing the business knowledge and sales efforts in seeking out the consumers who leased the merchandise, and the consumers who leased the merchandise from the defendants. Judgment was entered in favor of the plaintiff. The trial court found that the defendants had not committed fraud, but entered judgment on the basis that the defendants had violated the Washington securities act. The defendants appeal.

The issue raised is whether the transaction between the parties represents a sale of a "security" without said security being registered pursuant to the requirements of The Securities Act of Washington, RCW 21.20.

The defendants assert that the transaction did not involve a "security." They state that the transaction was similar to an installment cash loan secured by a chattel mortgage normally made by commercial banks to finance equipment purchases. The defendants argue that it was not necessary to notify the lessees that the defendant corporation's rights were assigned to the plaintiff because the assignment to the plaintiff of all of the corporate rights was not absolute and became effective only upon the corporation's default. The defendants state that the assignment of the 84 documents merely made the plaintiff a secured creditor, provided that she perfected her security interest. Such a commercial loan transaction, it is asserted, has not been included within federal or state definitions of a "security."

The defendants also point out that this transaction is similar to accounts receivable financing where the lender makes loans or advances secured by assigned accounts

receivable, without assuming credit risk and without notifying the assignor's customers. The claim is made that this form of non–notification financing involved a security device or collateral security which did not affect the existence of the debt due to the plaintiff, but provided the plaintiff with an immediate source of recovery.

The defendants further assert that this transaction is not an investment contract under federal or state law, and the fact that the loan involved risk did not make it an "investment contract." They state that the term "security" as defined in state and federal securities laws is confined to profit–sharing investments, and the transfer of rights under a lease of personal property is not an "investment" where it is made as collateral for a commercial loan.

Finally, the defendants state that the trial court erred when it isolated the words "collateral" and "trust" in defining them, for collateral–trust has its *own* meaning. They state that a collateral trust is one in which a debtor deposits collateral with a third party, with the third party, and not the debtor, acting as trustee.

The term "security" is defined in RCW 21.20.005(12) as follows:

"Security" means any note; stock; treasury stock; bond; debenture; evidence of indebtedness; certificate of interest or participation in any profit–sharing agreement; collateral–trust certificate; preorganization certificate or subscription; transferable share; investment contract; voting–trust certificate; certificate of deposit for a security; certificate of interest or participation in an oil, gas or mining title or lease or in payments out of production under such a title or lease; or, in general, any interest or instrument commonly known as a "security", or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing; or any sale of or indenture, bond or contract for the conveyance of land or any interest therein where such land is situated outside of the state of Washington and such sale or its offering is not conducted by a real estate broker licensed by the state of Washington. "Security"

does not include any insurance or endowment policy or annuity contract under which an insurance company promises to pay money either in a lump sum or periodically for life or some other specified period.

RCW 21.20.140 states:

Unlawful to offer or sell unregistered securities— Exceptions. It is unlawful for any person to offer or sell any security in this state, except securities exempt under RCW 21.20.310 or when sold in transactions exempt under RCW 21.20.320, unless such security is registered by coordination or qualification under this chapter.

■ As stated in *State v. Williams*, 17 Wn. App. 368, 371, 563 P.2d 1270 (1977):

When a state borrows federal legislation it also borrows the construction placed upon such legislation by the federal courts. *State v. Carroll*, 81 Wn.2d 95, 500 P.2d 115 (1972); *Juanita Bay Valley Community Ass'n v. Kirkland*, 9 Wn. App. 59, 510 P.2d 1140 (1973). Thus federal decisions construing the definition of "security" under the federal Securities Act of 1933 are pertinent to the construction of the same definition under the Washington act.

*Accord, Clausing v. DeHart*, 83 Wn.2d 70, 72, 515 P.2d 982 (1973).

■ The term "security" has been liberally defined in state and federal courts in recognition of the desire that securities regulation embody "a flexible rather than a static principle, one that is capable of àdaptation to meet the countless and variable schemes devised by those who seek the use of money of others on the promise of profits." *SEC v. W.J. Howey Co.*, 328 U.S. 293, 299, 90 L. Ed. 1244, 66 S. Ct. 1100, 163 A.L.R. 1043 (1946). The courts look to economic reality and to substance, not the form or legal terminology of a transaction, to ascertain whether the arrangement involved the sale of a security. *Tcherepnin v. Knight*, 389 U.S. 332, 336, 19 L. Ed. 2d 564, 88 S. Ct. 548, 553 (1967); *Ballard & Cordell Corp. v. Zoller & Danneberg Exploration, Ltd.*, 544 F.2d 1059, 1063 (10th Cir. 1976). As a result,

[n]o hard and fast rule fixes that which constitutes a "security." Rather, the question is determined on a case by case basis. The crucial question is whether the transaction comes within the regulatory purpose of the [Blue Sky Law].

*Sarmento v. Arbax Packing Co.,* 231 Cal. App. 2d 421, 424, 41 Cal. Rptr. 869, 870–71 (1964).

*State v. Hawaii Market Center, Inc.,* 52 Hawaii 642, 648, 485 P.2d 105, 109, 47 A.L.R.3d 1366 (1971), said:

> The salient feature of securities sales is the public solicitation of venture capital to be used in a business enterprise. . . . This subjection of the investor's money to the risks of an enterprise over which he exercises no managerial control is the basic economic reality of a security transaction. . . . Any formula which purports to guide courts in determining whether a security exists should recognize this essential reality and be broad enough to fulfill the remedial purposes of the Securities Act. Those purposes are (1) to prevent fraud, and (2) to protect the public against the imposition of unsubstantial schemes by regulating the transactions by which promoters go to the public for risk capital.

The utilization of a risk analysis gives the court a clear view of the economic realities involved in a transaction, and aids it in deciding whether the particular transaction under consideration falls within the purview of the Securities Act. *See* Hannan & Thomas, *The Importance of Economic Reality and Risk in Defining Federal Securities,* 25 Hastings L.J. 219, 235–53 (1974); Comment, *Notes as Securities Under the Securities Act of 1933 and the Securities Exchange Act of 1934,* 36 Md. L. Rev. 233, 244–45 (1976). The question then is whether the investor, induced by the promise of a valuable return, contributed "risk capital" to a venture, the success or failure of which was dependent on essential managerial or entrepreneurial efforts supplied solely by the promoters. *See SEC v. Glenn W. Turner Enterprises, Inc.,* 474 F.2d 476, 482 (9th Cir.), *cert. denied,* 414 U.S. 821, 38 L. Ed. 2d 53, 94 S. Ct. 117 (1973); *State v. Hawaii Market Center, Inc., supra.*

An examination of a number of factors aids us in our inquiry: (1) *"time"*—the longer a party's capital outlay is subject to the promoter's management the more likely the transaction will be like a "security"; (2) "existence and extent of *collateralization"*—an unsecured or undersecured lender or investor is "more dependent upon the managerial skills of the borrower than is a secured party who can look to the collateral in case of inability to repay"; (3) *"form* of the obligation"—although it will not be dispositive, "the form utilized may help to explain the circumstances of issuance of the obligation"; (4) *"circumstances* of issuance"—whether instruments embodying the promoter's inducements were "issued to a single party or to a large class of investors sheds light on the nature of the financing"; (5) *"relationship"* between the amount invested and the size of the promoter's business—"the larger the relative amount, the greater the stake, and therefore the risk, of the lender"; (6) *"contemplated use"* of the funds procured—proceeds for capital expenditures or enterprise formation are generally "securities", while outlays used to maintain current financial position are not. *Great Western Bank & Trust v. Kotz,* 532 F.2d 1252, 1257–58 (9th Cir. 1976).

It is uncontroverted here that (a) the defendants were not licensed or registered securities salesmen; (b) the defendants engaged in a fund raising campaign resulting in the procurement of funds from approximately 45 people amounting to a total of at least $250,000; (c) the plaintiff, induced by a promise of a valuable return, was one of those who furnished funds to defendants; (d) the plaintiff's funds were used by the defendants for a capital expenditure; (e) 84 large electrical appliances, bought with the plaintiff's money, were designated as "security" for her initial outlay; and (f) amortization of the obligation to plaintiff was spread over a 3–year period and was satisfied only in part.

█ The fact that plaintiff was promised nothing more than repayment of her initial outlay with interest, or that the interest was at an established rate, will not prevent the transaction from involving a "security." *See El Khadem v.*

*Equity Sec. Corp.,* 494 F.2d 1224, 1229 (9th Cir.), *cert. denied,* 419 U.S. 900 (1974); *People v. Walberg,* 263 Cal. App. 2d 286, 69 Cal. Rptr. 457, 462 (1968). Proof of the presence of collateral in a transaction does not require removal of the transaction from the purview of the Securities Act. As observed in Comment, *Notes as Securities Under the Securities Act of 1933 and the Securities Exchange Act of 1934, supra* at 246–47:

> Looking to the two extremes possible with regard to collateralization, the governing principle becomes apparent. On the one hand, collateral that is many times more valuable than the face amount of the note and that is not susceptible to market fluctuation would tend to make the transaction risk–free and therefore not a security transaction within the securities Acts. On the other hand, with a note secured by no collateral the risk of loss would be substantial. Degrees of collateralization between these two extremes are possible and there is no precise point at which to conclude unequivocally that the note becomes risk–free. This is a decision for the finder of fact, and several factors should be considered in light of the purposes of the securities Acts, including the value of the collateral in relation to the face amount of the note, the form of the collateral, and its susceptibility to market fluctuations.

The defendants stress the fact that the plaintiff's initial outlay was fully secured by the provision in their agreement allowing for assignment to the plaintiff of all the corporate rights in the appliances in case of default. We agree that where the borrower has shown the investor's interest was "fully secured" (*Hamilton Jewelers v. Department of Corps.,* 37 Cal. App. 3d 330, 112 Cal. Rptr. 387, 390 (1974); *Zabriskie v. Lewis,* 507 F.2d 546 (10th Cir. 1974)), or was a "risky loan" instead of "risk capital" (*United Cal. Bank v. THC Fin. Corp.,* 557 F.2d 1351, 1358–59 (9th Cir. 1977); *Tri–County State Bank v. Hertz,* 418 F. Supp. 332, 336–37 (M.D. Pa. 1976)), that the transaction will not involve a "security." Here, neither was shown.

The steps taken in the transaction under consideration involved (1) an initial outlay of funds to the defendants by

plaintiff, (2) the use of these funds by the defendants to buy large household appliances "for" the plaintiff, (3) the "conditional sale" of these appliances to the defendants' corporation, (4) the pledging of the appliances as collateral to "secure" plaintiff's investment, and (5) the lease of these appliances by the defendants' corporation to individual consumers with the option to buy. The record is silent with regard to the extent of the corporation's *unencumbered* rights in the collateral that allegedly "fully secured" plaintiff's investment, and who disposed of the 42 remaining appliances at the time of bankruptcy. The record does show, nevertheless, that (1) the plaintiff never repossessed and disposed of the remaining 42 appliances; (2) the plaintiff lost $6,308 on this venture; and (3) at least one lienholder existed with priority over the plaintiff. Although it is conceded that plaintiff never perfected her security interest in the appliances, this is not dispositive, for there is nothing in the record that would show plaintiff was ever assured of having the opportunity to be first in priority as a lienholder. Without this assurance, any number of prior undisclosed liens could have encumbered the collateral at the time it was pledged as "security" to a point at which even if plaintiff had perfected her security interest it would have been to no avail. *Cf. Barnett v. Everett Trust & Sav. Bank,* 13 Wn. App. 332, 334–35, 534 P.2d 836 (1975).

We view this transaction, as did the trial court, to involve (1) the outlay of capital by an unsophisticated investor induced by promises of a valuable return, (2) the lack on the part of the investor to access to detailed inside financial information, (3) the use of the investor's money for a capital expenditure, (4) a long term obligation on the part of the borrower's/promoter's corporation, (5) undersecured collateralization on the outlay of capital, and (6) a lack of authority on the part of the investor to participate in any essential entrepreneurial or managerial decision affecting the failure or success of the enterprise. We deem such a transaction to be the kind of "unsubstantial scheme" the securities laws intend to stop. As observed in *SEC v. C.M.*

*Joiner Leasing Corp.,* 320 U.S. 344, 351, 88 L. Ed. 88, 64 S. Ct. 120, 124 (1943), "[n]ovel, uncommon, or irregular devices, whatever they appear to be, are also reached [under this definition of a security]."

The judgment is affirmed.

WILLIAMS and ANDERSEN, JJ., concur.

Petition for rehearing denied June 22, 1978.

Review granted by Supreme Court November 17, 1978.