James C. **HADSELL**, Plaintiff-Appellee,

v.

Larry H. **HOOVER**, Defendant-Appellant.

**Computronic Industries Corporation et al., Defendants.**

No. 73–1110.

United States Court of Appeals, Tenth Circuit.

Argued and Submitted Aug. 13, 1973.

Decided Sept. 13, 1973.

William R. Fishman, Denver, Colo., for plaintiff-appellee.

James W. Heyer, Lakewood, Colo., for defendant-appellant.

Before LEWIS, BARNES * and Mc-WILLIAMS, Circuit Judges.

BARNES, Circuit Judge:

This appeal is from a judgment entered upon a jury verdict against appellant and others for fraud under the federal securities laws. Plaintiff-appellee, Hadsell, filed his complaint in the United States District Court for the District of Colorado, alleging, inter alia, conduct in violation of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j, 48 Stat. 891, and Rule 10b–5, 17 C.F.R. § 240.10b–5, implemented thereunder; and Section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q, 48 Stat. 84. Only defendant-appellant Hoover, one of several defendants who received the adverse judgment in the matter below, has appealed. Our jurisdiction rests in 28 U.S.C. § 1291.

At all material times, Hoover was president of Western General Corporation (herein Western General or Western), a New York corporation with offices in Denver, Colorado. Western was a holding company with assets consisting of securities and real estate investments, most of them pledged or mortgaged. Through Hoover, Western solicited operating funds from Hadsell. Hadsell refused an offer to loan Western money, but agreed to purchase unregistered stock held by Western in General Energy Corporation (herein General Energy). Thirty thousand shares of General Energy were sold to Hadsell for $75,000 through two transactions: twenty thousand shares were sold on December 11, 1968, and an additional ten thousand shares were sold on January 11, 1969. The price per share each time was $2.50 per share. The alleged fraud occurred with respect to these two transactions.

The following material evidence was admitted at trial in support of a finding of fraud:

(1) *Western General's repurchase agreement, (Plaintiff's Ex. 3)*:

Western agreed to repurchase the General Energy stock from Hadsell one year from the date of sale (December 11, 1969) at a price of $3.50 per share. At the time of the sale to Hadsell, registered shares were traded over the counter at $6.00. The shares which Hadsell purchased, however, were unregistered and could not have been sold over the counter at any price. Hadsell knew this, and therefore it seems obvious to us that he primarily relied upon the repurchase agreement in making his purchases. Subsequent to the purchase, both Western and General Energy became insolvent; the shares were worthless and Western was unable to repurchase. (Hadsell still has the stock; he has made no efforts to register it so as to effect a secondary sale.)

(2) *Western General's financial statement:*

Prior to the purchases, Hoover showed Hadsell a financial statement purportedly showing the net worth of Western General as of September 30, 1968, and discussed the statement in detail with him. It, and he, indicated that Western General was worth "substantially more" than $3,000,000 (R.T. at 27), and that "all its companies were operating at a profit" (R.T. at 29). At trial, Hadsell proved that Western General, in the fall of 1968, and on or about September 30, 1968, had operating expenses of $3,000 per month, but no income; was some $3,200,000 in debt, and had current liabilities (due in one year) of $309,000 (R.T. at 133). It had overdue or pressing lease obligations with respect to certain of its real estate investments. None of this was told Hadsell. No profit and loss statement was shown Hadsell (R.T. at 109). Hadsell necessarily re-

* Honorable Stanley N. Barnes of the Ninth Circuit, sitting by. designation.

lied upon the financial stability of Western General if he relied upon its repurchase agreement in making the stock purchases of General Energy.

(3) *Material misstatements or omissions:*

The following misstatements or omissions were made incident to the sale of the General Energy stock:

(a) The accountant who prepared the financial statement of Western General as of September 30, 1968, (Ex. 1), issued a "qualification letter" (Ex. 2) which became a part of the statement (R.T. at 181–82), to the effect that he could not verify assets and accounts receivable, nor could he verify the value of the assets included in the statement. Hoover had received the letter prior to his discussion with Hadsell, but there is no indication in the record that he showed the letter to Hadsell nor that he mentioned it to him.

(b) In discussing the financial statement with Hadsell, Hoover represented that the listed assets were worth more than they were indicated on the statement. (R.T. at 27).

(c) Hoover failed to indicate that Western General was planning to liquidate some of its assets to pay off debts.

(d) Hadsell was not informed that certain parties would receive commissions for obtaining the General Energy stock sale to Hadsell, and that the commissions would be taken from the receipts of the transactions. (R.T. at 38).

(4) *Computronic Industries:*

Computronic Industries Corporation (herein Computronic), is a corporation whose stock was traded over the counter. After the sale of General Energy stock to Hadsell, Western General encountered further financial difficulties. An arrangement was made (Ex. 9) whereby almost all Western General's assets were transferred to Computronic.[1]

Hadsell was not informed by Western General of the transfer of its assets. Western General retained the obligation to Hadsell, however, together with other liabilities and some "three to four hundred thousand shares of Computronic stock." (R.T. at 146).

Hadsell learned of this, and his attorney made demand upon Computronic to assume Western General's obligation to Hadsell under the repurchase agreement. Computronic agreed, and assumed the obligation. Hadsell was then shown two financial statements indicating the net worth of Computronic as of August 31, 1969; one was audited and indicated a net worth of $4,894,273, the second was unaudited and indicated a net worth of $5,334,622.13. It was signed by Mr. Hoover (Ex. 10). The audited statement was later withdrawn because the Securities and Exchange Commission objected to a lack of proof of the value of the underlying assets. At the time of trial, Computronic was insolvent.

(5) *Promissory notes:*

Computronic assumed the Western General obligation to repurchase the General Energy stock from Hadsell by executing three promissory notes for a total amount of $115,400, $10,400 more than the original repurchase agreement called for. The notes were issued on January 15, 1970, and were due in 75 days. Computronic retained the option to make payment by delivery of certain irrevocable letters of credit on the Bank of Asia, Bangkok, Thailand. Hadsell did not receive payment of the notes, either in the form of cash, or letters of credit.

The matter was tried before a jury and a judgment was entered upon a verdict against Hoover and three other de-

---

1. The briefs are not clear on this issue. Both parties agree on the fact that all or most all the assets were transferred by Western General to Computronic, and the record so states (R.T. at 148), but the method whereby this was effected is not indicated. We conclude that Western General received 5,000,000 shares of Computronic stock in return for most of its assets.

fendants. Following the verdict, the defendants unsuccessfully moved for a judgment notwithstanding the verdict.

On appeal, Hoover does ". . . not contest the credibility or sufficiency of the evidence . . ." (Appellant's Brief at 5.) He does not deny that when there is conflicting testimony, "the resolution of the jury is conclusive". (*id.*) Rather, he argues that Hadsell does not have a cause of action pursuant to the federal securities laws. At best, Hoover maintains there exists only an action for breach of contract with respect to the repurchase agreement. He also argues that "[t]here was no fraud in connection with the purchase of securities involved here. The purity of that sale was unsullied." (Appellant's Brief at 16.)

■ This argument, however, is in direct conflict with Hoover's statement that he does not contest the credibility or sufficiency of the evidence. We do not find it necessary to determine which position Hoover intends to rely upon, because we find that there was sufficient substantial evidence to warrant a jury in finding a scheme to defraud. It did so. We therefore confine our analysis to the question of whether Hadsell made out an actionable claim under the federal securities laws, or whether his only remedy was a common law claim for breach of contract.

Hoover relies upon Seward v. Hammond, 8 F.R.D. 457 (D.C.Mass.1948), where a district court held that a failure to perform under an agreement in which the plaintiff was to induce another to sell stock in return for the defendant's payment of money was not a securities fraud, but a breach of contract. *Cf.* Fuller v. F. I. Dupont, Glore, Forgan & Co., 54 F.R.D. 557 (D.C.Mo.1971). In Richardson v. MacArthur, 451 F.2d 35 (10th Cir. 1971), this court announced the rule for determining whether a claim is one actionable under the federal securities laws or under common law contract.

"In short, whether the failure to follow through on an agreement to purchase or sell stock is a mere breach of a contract or whether it amounts to a manipulative or deceptive device, or a contrivance in contravention of § 10(b) depends upon the facts and circumstances developed at trial." (Footnotes omitted.) Richardson v. MacArthur, *supra*, at 40. *Cf. also:* Brod v. Perlow, 375 F.2d 393 (2nd Cir. 1967); Allico v. Amalgamated, 397 F.2d 727 (7th Cir. 1968).

As Judge Hill stated in 1965, a wide and broad interpretation of the law is required by the definitions in the federal law as to what is a "purchase", a "sale", or a "security".

"It is not necessary to allege or prove common law fraud to make out a case under the statute and rule (Xb–5). It is only necessary to prove one of the prohibited actions such as the material misstatement of fact or omission to state a material fact." Stevens v. Vowell, 343 F.2d 374, 379 (10th Cir. 1965).

Immediately before the last statement quoted, this circuit held that the rule makes it unlawful to

". . . Employ any device, scheme or artifice to defraud; make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person. The validity of this rule has been upheld as a lawful exercise of the Commission's power. Hooper v. Mountain States Securities Corporation, 5th Cir., 282 F.2d 195, cert. denied, 365 U.S. 814, [81 S.Ct. 695, 5 L.Ed.2d 693]. . . ." (*id.* at 379.)

And the same opinion holds that proof of but one prohibited action (such as a material misstatement, or the omission

to state a material fact) makes out a case, citing three Ninth Circuit cases.

When we consider the broad remedial policies of the federal securities laws advocated and advanced by our Supreme Court (J. I. Case v. Borak, 377 U.S. 426, 431–432, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964), and SEC v. Capital Gains Research Bureau, Inc., 375 U.S. 180, 195, 84 S.Ct. 275, 11 L.Ed.2d 237 (1963)) such policies are best served by such pronouncements as those already enunciated by this circuit, and as quoted above, we have no difficulty in holding that common law breach of contract relief cannot be plaintiff's only remedy below. *See also:* Mitchell v. Texas Gulf Sulphur Co., 446 F.2d 90, 96–99 (10th Cir. 1971), cert. denied, 404 U.S. 1004, 92 S.Ct. 564, 30 L.Ed.2d 558 (1971).

█ Upon the record, we find that the facts and circumstances developed at trial were clearly sufficient to indicate a scheme to defraud within the meaning of Section 10(b) of the Securities and Exchange Act of 1934.

For these reasons, the judgment of the district court entered upon a verdict against Hoover and for Hadsell is affirmed.