SECURITIES AND EXCHANGE COMMISSION, Plaintiff,

v.

George PLATT, Stephen B. Platt, Barry L. Switzer, Lee Allan Smith, Sedwyn T. Kennedy, Harold D. Deem, Harold L. Hodges, Robert E. Amyx, Robert M. Hoover, Jr., James Hart, William R. Hegberg, Stephen M. Stay, and Arthur M. Fischer, Defendants.

Civ. A. No. CIV–83–225–Sf.

United States District Court, W.D. Oklahoma.

May 20, 1983.

---

T. Christopher Browne, Nancy E. McGinley, S.E.C., Fort Worth, Tex., for plaintiff.

Robert G. Grove, Grove & Grove, David Machanic, Michael Minnis, Pierson, Ball & Dowd, Harry A. Woods, Jr., Crowe & Dunlevy, Oklahoma City, Okl., Frederic T. Spindel, Washington, D.C., Daniel S. Greenfeld, Seyfarth, Shaw, Fairweather & Geraldson, New York City, for defendants.

## MEMORANDUM AND ORDER

SAFFELS, District Judge, Sitting by Designation.

This is a lawsuit involving alleged violations of Section 10(b) of the Securities Exchange Act of 1934 [15 U.S.C. § 78j(b)], and Rule 10b–5 [17 C.F.R. § 240.10b–5] against all defendants, and alleging a violation of Section 16(a) of the Securities Exchange Act [15 U.S.C. § 78p(a)] and Rules 16a–1 and 16a–8 [17 C.F.R. 240.16a–1 and § 240.16a–8] against defendant George Platt. The matter comes before the court on motions by nearly all defendants for summary judgment or for dismissal.

The court has heard oral argument on all motions and has studied the briefs of the parties. The court finds that all motions to dismiss or for more definite statement should be denied. The court finds that the motions for summary judgment of defendants Stay, Fischer and Hart should be sustained. The court further finds that the motions for summary judgment of defendants George Platt, Stephen Platt, Smith, Kennedy, Deem, Hoover, Hodges, Amyx and Switzer should be denied.

I

A

TRADING IN PHOENIX STOCK

The issue before the court on these summary judgment motions is whether or not plaintiff has sufficiently responded to the motions for summary judgment by setting forth specific facts showing there is a genuine issue for trial, as is required by F.R.C.P. 56(e). The following discussion of facts is done for purposes of ruling on the summary judgment motions only. The parties should not construe the discussion of the facts in any way to indicate how the court will ultimately rule on the issues presented for determination. In reviewing the discussion below, reference is directed to a chart prepared by one of the defendants and attached to this opinion as Appendix A.

In a light most favorable to the party opposing summary judgment, the court finds that on or about June 4, 1981, Phoenix Resources Company [Phoenix] was a company devoted to oil and gas exploration and development whose common stock was registered with plaintiff and traded on the over-the-counter market. Texas International Corporation [TIC] was an oil and gas exploration company whose stock was regis-

tered with plaintiff and traded on the New York Stock Exchange.

Defendant George Platt was the Chief Executive Officer and Chairman of the Board of TIC and also a director of Phoenix. Phoenix was not doing well, and the future of Phoenix was uncertain. For some time, George Platt had sought either to split Phoenix from TIC completely, to merge the two companies, or to sell Phoenix and liquidate its assets.

On or about June 4, 1981, George Platt and another director of Phoenix, who was also the President of TIC, met with an investment banker in New York City to discuss retention of the banking firm for the purpose of disposing of Phoenix or its assets. The investment banker agreed to look into the affairs of Phoenix to determine whether or not his firm would be retained.

Information about the liquidation of Phoenix and the proposed retention of an investment banking firm to evaluate such liquidation was material and non-public information, not available to the trading public or to owners of Phoenix common stock.

On or about June 1, 1981, George Platt purchased five hundred (500) shares of Phoenix common stock with his son, Stephen Platt, without disclosing such confidential information to the sellers and without reporting such purchase to plaintiff, as is required by 15 U.S.C. § 78p(a) and the rules promulgated thereunder. On or about June 5, 1981, George Platt purchased six hundred (600) shares of Phoenix common stock at Forty-One and 50/100 Dollars ($41.50) per share without disclosing such confidential information to the sellers and without reporting such purchase to plaintiff.

On or about June 5, 1981, George Platt allegedly told his son about the possible liquidation of Phoenix. Stephen Platt purchased five hundred (500) shares of Phoenix common stock on Monday, June 8, 1981, at Forty-Two and 50/100 Dollars ($42.50) per share without disclosing the non-public information to the sellers.

On Saturday, June 6, 1981, after returning from New York, George Platt attended a track meet at the University of Oklahoma. Platt's twelve-year-old son was competing in the track meet that day. Also present was defendant Switzer, the football coach at the University of Oklahoma, whose son was also scheduled to compete in the track meet that day. The record before the court is that Switzer was either sunbathing or sitting on the bleacher seats waiting for his son to compete. Switzer was either beside or behind George Platt and his wife in the bleachers. There was a lot of empty space in the bleachers. Switzer overheard Platt tell his wife about the business trip to New York and what had transpired, including the information concerning the contemplated liquidation of Phoenix and the possible retention of the investment banking firm. Switzer knew Platt, knew who he was, and had already spoken with him five or six times that day. Some of their conversations had touched on the oil business. Furthermore, it is quite unusual for Platt to talk about business with his wife, beyond a comment in the nature of, "I've had a bad day," or something equally as vague.

That evening Switzer met defendant Kennedy over dinner and told Kennedy that "he was sitting in the stands at a track meet that his son was in, and sitting next to a person that he overheard talking to the person next to him that they were negotiating, or going to negotiate, or going to try and negotiate, liquidating or selling Phoenix Resources." Further, Switzer told Kennedy that this person was "with Texas International" and that "there was going to be a stockholders or directors meeting on Thursday to discuss the possibilities of selling or liquidating Phoenix Resources." See Kennedy Transcript, File No. FW–1758. It is not unusual for Switzer to give stock market tips to Kennedy. Both men are active traders in the stock market.

On the next day, Sunday, June 7, 1981, Kennedy is alleged to have told defendant Deem what Switzer told him, although there is little proof of this in the record. Deem is Kennedy's business associate. On Monday, June 8, 1981, Deem and Kennedy

jointly bought five thousand (5,000) shares of Phoenix common stock at Forty-Two and 75/100 Dollars ($42.75) per share through S & H Investments, their partnership trading account. On Tuesday, June 9, 1981, they bought another one thousand (1,000) shares. Kennedy often buys stock if he is sure Switzer is going to buy as well.

On Sunday, June 7, 1981, Switzer told defendant Smith he had a "good rumor" [*see* Smith Transcript, April 8, 1982, File No. FW–1758], and that he "overheard someone in front of him [at the track meet] who seemingly knew or was knowledgeable about a company that was to be liquidated. There, again, he overheard this Morgan Stanley name coming up and a meeting being held on Thursday and that there might be a possibility of a liquidation and that it might be a stock to buy to make some money. *Id.*

Smith and Switzer went to see Smith's friend and trading partner, Hodges, on Sunday, June 7, 1981. Smith said he had a stock tip that he got from Switzer, who had overheard the tip while listening to a conversation at a track meet. Smith and Switzer did not have the cash to invest on this tip, but they knew that Hodges had cash and could make the investment for them. They assured Hodges that "if the bottom fell out," they could make good on their obligation. [*See* Hodges Transcript, p. 50, April 7, 1982, File No. FW–1758.]

Hodges knew he could trust Smith and Switzer, so he agreed to make the investment. Hodges does a lot of investing on "tips and phone calls and what not." *Id.* at 51. Although he makes money on these transactions, sometimes he loses money. He states, "I bought a tremendous amount of Magic Circle on a phone call and I think probably right now I am better than one million dollars down in it, but we do it anyway ..." *Id.* at 51. Hodges did not ask questions about the source of this tip. *Id.* at 51–52.

On Monday, June 8, 1981, Hodges called defendant Amyx, his investment partner, and told him about the tip. Hodges did not know whether to buy Phoenix or TIC, so he told Amyx to buy both. On behalf of Hodges, Smith and Switzer, Amyx bought thirteen thousand (13,000) shares of common stock in Phoenix at prices between Forty-Three and 50/100 Dollars ($43.50) and Forty-Eight and 50/100 Dollars ($48.50) per share.

On Sunday, June 7, 1981, after meeting with Hodges, Smith communicated with defendant Hoover about "some rumors that the company [Phoenix] was going to be bought out, or something like that." *See* Hoover Transcript, p. 56, March 9, 1982, File No. FW–1758. Smith and Hoover had been buying and selling stock together for five or six years at that time. Hoover does a lot of "day trading" on rumors and tips, and at the time it was general knowledge around Oklahoma City that "Phoenix was a possible buyout." *Id.* at 39. Hoover doesn't actually remember whether Smith gave him a tip about Phoenix, or whether he bought the stock without a tip.

On or about Monday, June 8, 1981, Hoover purchased sixteen thousand five hundred (16,500) shares of Phoenix at prices between Forty-Three Dollars ($43) and Forty-Eight and 50/100 Dollars ($48.50) per share, allegedly on behalf of himself and Smith and Switzer.

On Sunday, June 7, 1981, Switzer either met Hart or talked to him by telephone. Switzer and Hart were planning to travel together to Miami, Florida, the following day. Switzer mentioned to Hart that he had overheard some information at a track meet that led him to believe that Phoenix stock was a good buy. Switzer might have told Hart that he, Switzer, had been sitting with the person who had disclosed this information. The name Platt might have been mentioned, but that name meant nothing to Hart.

Switzer had given Hart many stock market tips before, and, according to Hart, these tips had been disasters for the most part. Sometimes Hart would buy stock on Switzer's tips and sometimes he would not.

On Monday, June 8, 1981, Hart purchased seven hundred (700) shares of Phoenix stock

at between Forty-Two and 50/100 Dollars ($42.50) and Forty-Four and 50/100 Dollars ($44.50) per share.

As mentioned previously, George Platt told his son, Stephen Platt, about the contemplated liquidation of Phoenix and about the proposed retention of an investment banking firm. On or about Monday, June 8, 1981, Stephen Platt communicated to defendant Hegberg this information. On the same day, Hegberg purchased one thousand (1,000) shares of Phoenix common stock at Forty-Five Dollars ($45) to Forty-Five and 25/100 Dollars ($45.25) per share.

Hegberg told defendant Stay that he, Hegberg, was quite excited about Phoenix and that he, Hegberg, was going to buy stock in Phoenix or had already bought stock in Phoenix. Stay wondered if Phoenix was going to be involved in a merger, but Hegberg did not say whether or not there was going to be a merger, so Stay decided that there was not going to be a merger. Late on June 8, 1981, Stay called his broker to purchase Phoenix stock, but the market was closed. On June 9, 1981, Stay purchased one thousand (1,000) shares of Phoenix stock at Forty-Six Dollars ($46) per share.

On June 8 or 9, 1981, Hegberg telephoned his partner, defendant Fischer, and told him that he was thinking of buying Phoenix stock and that he thought that Fischer should do so too. Fischer and Hegberg have been partners in real estate ventures for ten years and, along with his other partner, Fischer has invested between one-half and one million dollars on Hegberg's recommendations, "sight unseen." *See* Fischer Transcript, pp. 33–34, June 4, 1982, File No. FW–1758.

No names were discussed during the phone call. Hegberg did not tell Fischer that he had any tips or was acting on rumor. Fischer trusted Hegberg's judgment and Fischer wanted to make some money. Fischer does not ordinarily buy or sell stock; he regards the stock market as a form of gambling, but he wanted to have some fun, so he decided to buy some stock in Phoenix.

On Wednesday, June 10, 1981, Phoenix made a public announcement that its board of directors had determined to dispose of the company and its assets and had retained an investment banking firm to conduct an evaluation of the proposed liquidation. The price of Phoenix stock, which had hovered at or around the Forty-Two Dollars ($42)-per-share level, rose to approximately Sixty-Nine Dollars ($69) per share. Eventually, the price of Phoenix reached Eighty Dollars ($80) per share, although the defendants herein had sold their stock for the most part long before this price was reached.

On Friday, June 12, 1981, George Platt sold six hundred (600) shares of Phoenix for a profit of Sixteen Thousand Two Hundred Dollars ($16,200).

Stephen Platt kept his Phoenix stock until November 5, 1981, when he sold it after a two-for-one split for a profit of between Fourteen Thousand Dollars ($14,000) and Sixteen Thousand Dollars ($16,000).

On June 10 and 12, 1981, Kennedy sold his six thousand (6,000) shares of Phoenix and made a profit of One Hundred Eighteen Thousand Five Hundred Eighty-Seven Dollars ($118,587), which he split with his partner, Deem.

On June 10 and 11, 1981, Amyx sold all thirteen thousand (13,000) shares of Phoenix for a profit of Two Hundred Five Thousand Fifty-Five Dollars ($205,055), which he split with Hodges, Switzer and Smith.

On Wednesday, June 10, 1981, Hoover sold all sixteen thousand five hundred (16,500) shares of Phoenix for a profit of Two Hundred Sixty-Seven Seven Hundred Twenty-Nine Dollars ($267,729), which he allegedly split with Switzer and Smith.

On June 10, 1981, Hart sold his seven hundred (700) shares of Phoenix for a profit of Fourteen Thousand Three Hundred Three Dollars ($14,303).

On June 10 and 12, 1981, Hegberg sold his one thousand (1,000) shares of Phoenix for a profit of Eighteen Thousand Five Hundred Twenty-Five Dollars ($18,525). Hegberg

has settled with the government in this case and is, for all practical purposes, no longer a defendant. Final settlement awaits court approval.

On Wednesday, June 10, 1981, Stay sold his one thousand (1,000) shares of Phoenix for a profit of Fifteen Thousand Five Hundred Dollars ($15,500).

On Wednesday, June 10, 1981, Fischer sold his three thousand (3,000) shares of Phoenix for a profit of Thirty-One Thousand Five Hundred Dollars ($31,500), part of which was shared with a third-party who is not a named defendant in this case.

Plaintiff seeks injunctive relief, an order requiring defendants to disgorge their profits from this trading, and prejudgment interest.

## B

### THE LAW TO BE APPLIED

■ Section 10(b) of the Securities Exchange Act of 1934 [15 U.S.C. § 78j(b)] and Rule 10b-5 (17 C.F.R. § 240.10b-5], were enacted to prevent inequitable and unfair practices and to insure fairness in securities transactions. The statute states:

"It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—

\* \* \* \* \* \*

"(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

Rule 10b-5 states:

"It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

"(a) To employ any device, scheme, or artifice to defraud,

"(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

"(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security."

The essence of the rule is that anyone who, trading for his own account in the securities of a corporation, has access, directly or indirectly, to information intended to be available only for a corporate purpose and not for the personal benefit of anyone, may not take advantage of such information knowing it is unavailable to those with whom he is dealing: the investing public. *In Re Cady, Roberts & Co.,* 40 S.E.C. 907, 912 (1961).

■ On their face, neither 15 U.S.C. § 78j(b) nor Rule 10b-5 refer to insiders or require disclosure of facts known to one party to a stock transaction but unknown to the other. Nevertheless, the rule is generally accepted that when one party to the transaction is an insider who occupies a fiduciary relation in regard to the other, Rule 10b-5 requires disclosure of any material facts known to him and unknown to the other. This fiduciary duty arises from being an insider, and is imposed by law because the person is an insider. *See Speed v. Transamerica Corp.,* 99 F.Supp. 808, 828-29 (D.Del.1951), *aff'd.* 235 F.2d 369 (3rd Cir. 1956). *See also, Rogen v. Ilikon Corp.,* 361 F.2d 260, 265-66 (1st Cir.1966); *Kohler v. Kohler Co.,* 319 F.2d 634, 638 (7th Cir.1963).

■ Insiders are liable if they trade for their own profit in the securities of a corporation when they have access, directly or indirectly, to information concerning that corporation which is intended to be available only for a corporate purpose and not for the personal benefit of anyone. Such an insider is not permitted to take advantage

of such information knowing it is unavailable to those with whom he is dealing. Therefore, anyone in possession of material inside information must either disclose it to the investing public or abstain from trading in or recommending the securities concerned while such inside information remains nonpublic. *Securities and Exchange Com'n. v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 848 (2nd Cir.1968), *cert. denied* 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969), *appeal after remand* 446 F.2d 1301 (2nd Cir.1971), *cert. denied* 404 U.S. 1005, 92 S.Ct. 562, 30 L.Ed.2d 558, *reh. denied* 404 U.S. 1064, 92 S.Ct. 733, 30 L.Ed.2d 753 (1972) [hereinafter cited as *Texas Gulf Sulphur*].

In *Texas Gulf Sulphur, supra,* the Second Circuit Court of Appeals held that not only could corporate insiders be liable for violating Rule 10b–5 by trading on the basis of inside information, but also that they could be held liable for tipping others who go on to purchase securities while in possession of material non-public information. *Id.* at 852. Tipping by corporate insiders is a violation of Rule 10b–5 because it is an abuse of the insider's fiduciary responsibilities. *Id.* at 850, n. 12. The insider who tips may be liable for all the trading which can be traced to information emanating from him. *Id.* at 856, n. 23.

The court in *Texas Gulf Sulphur* did not have before it the question of liability of tippees who trade in securities based on confidential information. Nevertheless, the court stated in dictum that their conduct was "equally reprehensible" with that of the insiders and tippers if their trading was done "with actual or constructive knowledge that the material information was undisclosed." *Texas Gulf Sulphur, supra,* at 853.

The liability of tippees was discussed in *Ross v. Licht,* 263 F.Supp. 395 (S.D.N.Y. 1967), where Licht was a relative of the controlling directors and shareholders, and the other two defendants, Grapel and Bluestone, were his close friends. Although they were not officers, directors or major shareholders, the court found all three to be liable for failing to disclose confidential facts known to them when they purchased the stock in question. The court stated, "If [Licht], Grapel and Bluestone were not insiders, they would seem to have been 'tippees' (persons given information by insiders in breach of trust) and subject to the same duty as insiders." *Id.* at 409–410.

This rule was quoted with favor in *Shapiro v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 495 F.2d 228, 237–38 (2nd Cir. 1974). The court held that tippees with confidential, material inside information have a duty to abstain from trading unless they disclose such information to their sellers, if they know or should know of the confidential source of the information and know it is not public information. *Id.*

The United States Supreme Court has also stated the rule. In *Chiarella v. United States,* 445 U.S. 222, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1980), the court stated, at p. 230, n. 12, 100 S.Ct. at p. 1116, n. 12, " 'Tippees' of corporate insiders have been held liable under § 10(b) because they have a duty not to profit from the use of inside information that they know is confidential and know or should know came from a corporate insider. [Citing *Shapiro.*] The tippee's obligation has been viewed as arising from his role as a participant after the fact in the insider's breach of a fiduciary duty."

*Chiarella* involved an employee of a financial printing company who worked as a markup man in the printing department. In the course of his employment, Mr. Chiarella worked on printing five announcements of corporate takeover bids. Although the names were left blank on his copies, Mr. Chiarella was able to deduce the name of the company about to be taken over. Without disclosing his knowledge, Mr. Chiarella purchased stock in the target company and sold the stock at a profit when the takeover bids became public.

The court held that no violation of § 10b–5 had occurred because Mr. Chiarella was neither an insider nor the tippee of an insider. The court held that "a duty to

disclose under § 10b–5 does not arise from the mere possession of non-public market information." *Id.* at 235, 100 S.Ct. at 1118. The duty to disclose arises only from a "relationship of trust and confidence between parties to a transaction." *Id.* at 230, 100 S.Ct. at 1115. Of course, insiders have such a fiduciary relationship, and the court strongly implied that tippees of insiders share in this fiduciary duty if they know the information they possess is confidential and they know or should know it came from a corporate insider. *Id.* at 230, n. 12, 100 S.Ct. at 1116, n. 12.

The court rejected any notion that a duty to disclose would arise merely from the fact that the persons who possessed material, non-public information "had regular access to market information," or occupied "strategic places in the market. . . ." *Id.* at 231, n. 14, 100 S.Ct. at 1116, n. 14. In the most narrow reading possible, the court in *Chiarella* therefore requires some duty on the part of the trader in securities before liability can be imposed for the use of material, non-public information.

How this duty arises and why it should be placed on the tippee is the subject of a number of theories. The court in *Chiarella* acknowledged the theory that tippees share the insider's fiduciary duty to the trading public because of the tippee's "role as a participant after the fact in the insider's breach of a fiduciary duty." *Id.* at 230, n. 12, 100 S.Ct. at 1116, n. 12.

Another theory is that trading tippees are liable along with unfaithful insiders for aiding and abetting a violation of Rule 10b–5, even though the liability arises in a civil lawsuit instead of a criminal proceeding. *Ross v. Licht, supra,* at 410. There is some support in this circuit for imposing liability on an aider and abettor theory. In *Kerbs v. Fall River Industries, Inc.,* 502 F.2d 731 (10th Cir.1974), the court held that liability for a § 10(b) and Rule 10b–5 violation could be proved by conduct on the part of a defendant which "constituted knowing assistance and participation in a fraudulent scheme" because such assistance or participation "gives rise to liability equal to that of the perpetrators themselves" as aiders and abettors. *Id.* at 740. *See also Zabriskie v. Lewis,* 507 F.2d 546 (10th Cir.1974), *infra. Kerbs,* however, did not involve tippers and tippees, and the opinion does not discuss their liability.

Finally, there is the theory that tippees occupy the same status as insiders and are subject to the same duty as insiders. *Ross v. Licht, supra,* at 410, *citing In Re Cady, Roberts & Co.,* 40 S.E.C. 907 (1961). *But, see, Walton v. Morgan Stanley & Co., Inc.,* 623 F.2d 796, 799, n. 6 (2nd Cir.1980).

■ Whatever the theory, the conclusion is inescapable that tippees are liable for violations of § 10(b) and Rule 10b–5 where they profit from the non-disclosure of inside information that they know is confidential and know or should know came from an inside source. *Chiarella, supra,* 445 U.S. at 230, n. 12, 100 S.Ct. at 1116, n. 12; *Shapiro, supra,* at 237–38.

It would serve no useful purpose, however, to carry this liability to the point of absurdity. As anyone can imagine, stock market tips can take on an infinite number of forms. As one commentator notes:

" . . . The abundance of tips and recommendations in the market vary widely in specificity. At one extreme is 'TGS is a good buy.' At or near the other is 'TGS found 25 million tons of high grade, pit-mineable zinc, copper, and silver in Timmins. . . .'

"It is difficult, perhaps impossible, to separate the specificity component from the source component. . . . Thus, one who trades on hearing a total stranger say 'TGS is a good buy' should not be a violator. But one who trades on being told the same thing by a director of a company, in a tone of mysterious and emphatic confidentiality, on emerging from a board meeting, may well be guilty of breaking the Rule."

2 Bromberg & Lowenfels, *Securities Fraud & Commodities Fraud,* Sec. 7.5(6)(c), p. 190.-15 (1982).

Bromberg & Lowenfels suggest that the liability of a tippee should be evaluated by taking into consideration: (1) the specificity

of the information contained in the tip; (2) whether or not the tippee knows or has reason to know that his information comes from an inside source; (3) whether or not the information is widely known among investors, that is, the degree to which the information, even if technically not public, has become known; (4) how true the information would appear to a person in the position of the tippee; (5) the extent to which the tippee used the information, that is, there should be no liability if the tippee had already made up his mind to invest in the security when he heard the tip; and (6) the remoteness of the tippee from the source of the tip (although this would appear related to the other factors).

Finally, we must keep in mind the applicable standards for ruling on a motion for summary judgment. In considering a motion for summary judgment, the court must examine all of the evidence in the light most favorable to the party opposing the motion. *Mogle v. Sevier County School Dist.,* 540 F.2d 478, 482 (10th Cir.1976), *cert. denied* 429 U.S. 1121, 97 S.Ct. 1157, 51 L.Ed.2d 572 (1977); *Frey v. Frankel,* 361 F.2d 437, 442 (10th Cir.1966). The burden is on the moving party to prove its entitlement to summary judgment beyond a reasonable doubt. *Madison v. Deseret Livestock Co.,* 574 F.2d 1027, 1037 (10th Cir.1978); *Mustang Fuel Corp. v. Youngstown Sheet & Tube Co.,* 516 F.2d 33, 36 (10th Cir.1975). Summary judgment is a drastic remedy to be applied with caution in order to preserve a litigant's right to trial. *Machinery Center, Inc. v. Anchor National Life Ins. Co.,* 434 F.2d 1, 6 (10th Cir.1970). Nevertheless, if, after consideration of all the facts and the drawing of all inferences from those facts in favor of the party opposing the motion, it is discovered that no triable issue of material fact exists, the defendant is entitled to summary judgment *as a matter of law. Ando v. Great Western Sugar Co.,* 475 F.2d 531, 535 (10th Cir.1973).

## C

## DISCUSSION

What evidence does the government have that would show that there are any materi-al facts in dispute as to the liability of these defendants for violations of § 10(b) and Rule 10b–5?

### 1.

### George Platt

Defendant George Platt has been charged with violations of § 10(b) and Rule 10b–5, as well as § 16(a) and Rules 16a–1 and 16a–8. The summary judgment motion on his behalf is addressed only to the § 10(b) and Rule 10b–5 allegations. As to these allegations, George Platt moves the court for summary judgment on the grounds that there is no evidence of knowing or intentional communication by George Platt to Switzer on June 6, 1981, of any material, non-public information, therefore, no breach of fiduciary duty by George Platt. The motion is not directed to alleged tips by George Platt to his son.

By this argument, the court takes George Platt's position to be that he does not contest his standing as an insider in this litigation, at least for purposes of the summary judgment motion. That being the case, there is no need to discuss Platt's position as a fiduciary in relation to the public which traded in Phoenix stock.

The court finds sufficient evidence in the record of the materiality of the information allegedly communicated by George Platt to Switzer to require a trial. "The basic test of materiality ... is whether a reasonable man would attach importance [to the information] ... in determining his choice of action in the transaction in question." *List v. Fashion Park, Inc.,* 340 F.2d 457, 462 (2nd Cir.1965), *cert. denied sub nom. List v. Lerner, d/b/a Lerner & Co.,* 382 U.S. 811, 86 S.Ct. 23, 15 L.Ed.2d 60, *reh. denied* 382 U.S. 933, 86 S.Ct. 305, 15 L.Ed.2d 344. The court does not think that George Platt seriously considers the information immaterial, and therefore will devote no more discussion to the subject.

It is the court's finding that there is sufficient evidence of the intentional and knowing nature of the communication of

the information in question by George Platt to Switzer to deny a motion for summary judgment. True, it is circumstantial evidence, but many a case has gone to the jury in civil, as well as criminal, trials on circumstantial evidence.

Although Switzer claims to have overheard the tip in question during a conversation between George Platt and his wife, neither Platt nor his wife remember the conversation taking place. This discrepancy in testimony goes to the heart of the question of intent. Furthermore, Platt and Switzer admit to knowing one another. During the course of the track meet, Switzer and Platt had a number of conversations, including a conversation about their respective personal investments in the oil and gas industry. Platt had just returned from his meeting with the investment banker in New York, and, from Hegberg's statements, we know that Phoenix was a trouble spot with Platt and could have been very much on Platt's mind.

Switzer engages in the trading of securities and has experience investing in energy stocks. There were a lot of rumors in Oklahoma City about Phoenix, and a number of the defendants remember these rumors and remember paying attention to them. Switzer knew Platt and knew his relationship to Texas International and Phoenix, at least to the extent that Switzer knew George Platt was some kind of director or officer of each company.

Switzer is a celebrity in Oklahoma. George Platt is a supporter of Oklahoma University football. Platt had his football tickets upgraded by making a call to Switzer's office. Platt had taken the trouble on a previous occasion to obtain Switzer's autograph for his younger sons.

Switzer came and went at the track meet. As the football coach, he was allowed to pass from the stands to the field whenever he wanted. Whenever he came back to that portion of the stands where George Platt and his wife were sitting, he greeted them, or at least acknowledged their presence.

This is an extremely brief version of the facts, and does justice to neither party's case. However, the court finds that in a light most favorable to plaintiff, there is sufficient evidence to prove a motive to disclose this confidential information, namely to impress Switzer, a national celebrity. The opportunity was certainly present; Switzer was behind the Platts and within earshot. Finally, intent could be proved by the fact that it was very unusual for George Platt to discuss any aspects of his business with his wife; thus, the inference arises that his remarks, if any, about his business trip to New York were aimed at Switzer and not his wife.

### 2.
### *Switzer*

■ Switzer stands in no different position than George Platt. Although the extent of Switzer's knowledge about George Platt is in dispute, there is sufficient evidence to support a finding that Switzer knew that Platt was a director, officer or substantial shareholder in TIC and occupied a similarly high position in Phoenix. In other words, Switzer could be found to have known that Platt was an insider. Similarly, it would be proper for the finder of fact to infer from the evidence that the disclosure to Switzer was intentional and not inadvertent. The disclosure of confidential information by Platt to his wife might be found a breach of a fiduciary duty under the circumstances. Switzer's conversation with others that the information would be public after a meeting of some kind on Thursday, June 11, 1981, is evidence that he knew the information was confidential. As the court noted above, questions as to the materiality of the information and whether or not Switzer traded in the stock based on this information are not really in dispute in the summary judgment motion. Thus, there exists sufficient evidence in the record at this time to prevent the court from entering judgment in favor of Switzer as a matter of law.

### 3.
### *Kennedy, Deem, Smith, Hoover,*
### *Hodges and Amyx*

■ These defendants are at the outer limits of liability under the law as it stands

at this time. In this court's opinion, however, these defendants should remain in the case, at least until the court has the opportunity to assess the testimony and credibility of the witnesses directly. By his own admission, Kennedy was told that the tip, intentional or otherwise, came from someone "with Texas International," and that there "was going to be a stockholders' or directors' meeting on Thursday to discuss the possibilities of selling, or liquidating, Phoenix Resources." Kennedy Transcript, *supra*, at 64. This would lead to the permissible inference that Kennedy knew the information was not yet public and knew or should have known that it came from an inside source. Deem stands in a similar position either as a tippee or as an aider and abettor (discussed *infra*).

Smith admits that Switzer told him the tip was from "someone that should know" [Smith Transcript, p. 28], that in his recollection that it involved liquidation of Phoenix stock, that "80 rings a bell as to a possible price that it would be liquidated for" [*id.* at 37], and that there was "this Morgan Stanley name coming up and a meeting being held on Thursday" [*id.* at 42]. The name Morgan Stanley "seemed to be impressive to me at least because I was more familiar with it than Barry [Switzer] was...." *Id.* at 64. This too leads the court to conclude that a triable issue exists whether Smith knew the information was not yet public and knew or should have known that it came from an inside source.

As to Deem, Hoover, Hodges and Amyx there is sufficient evidence in the record to show that triable issues exist at least as to whether their acts brought them within the definition of aiders and abettors, as those terms were defined by the circuit court in *Zabriskie v. Lewis*, 507 F.2d 546, 554 (10th Cir.1974), and *S.E.C. v. Bruce*, No. 77–1057 (10th Cir., *unpublished*, 7/31/78). This conclusion is based on language in *Zabriskie*, *supra*, which states that a link between defendants alleged to be aiders and abettors may be proven by a tacit understanding between the parties or may be "inferred from parallel or complementary acts, prior relationships, common benefits, interchange

of communications or other relevant factors." *Id.* at 554. The evidence in this case shows that Hodges and Amyx divided the profits from the transactions in stock among themselves and with Smith and Switzer. This is evidence of "common benefits" and satisfies the *Zabriskie* rule, at least for purposes of concluding that the court cannot at this time enter judgment against the plaintiff as to Hodges and Amyx as a matter of law.

Deem is in a similar position. The evidence is that Deem and Kennedy traded as partners on the basis of this alleged intentional tip and split the profits between them. This is sufficient under *Zabriskie* to create a triable issue of fact and to overrule Deem's motion for summary judgment.

There is evidence before the court to raise a triable issue on the aider-and-abettor theory as to Hoover because he admits that Smith was his "50 percent partner" in the transaction which gave rise to this lawsuit. Therefore, Hoover's motion for summary judgment shall also be overruled.

■ Plaintiff's case against these six defendants, as well as against George Platt and Switzer, hinges on a finding by the trier of fact that Platt's tip to Switzer was intentional. Scienter is a necessary element of a violation of § 10(b) and Rule 10b–5 [*Aaron v. S.E.C.*, 446 U.S. 680, 100 S.Ct. 1945, 64 L.Ed.2d 611 (1980); *Securities & Exchange Com'n. v. Haswell*, 654 F.2d 698 (10th Cir.1981)], regardless of whether injunctive relief or disgorgement of profits is sought. "Scienter," as used in *Aaron*, refers to "a mental state embracing intent to deceive, manipulate or defraud." *Aaron v. S.E.C.*, *supra*, 446 U.S. at 685, n. 5, 100 S.Ct. at 1950, n. 5, *quoting Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194, n. 12, 96 S.Ct. 1375, 1381, n. 12, 47 L.Ed.2d 668 (1976). The court sees no reason not to require proof of scienter in this case as well, that is, proof of a mental state to disclose confidential information or to breach one's fiduciary duty. The cases cited by plaintiff, to the contrary, *Shapiro*, *supra*, and *Chiarella*, *supra*, are not on point, at least not at the

pages to which the court's attention is directed.

In view of the Supreme Court's holding in *Hochfelder, supra,* aiding and abetting is not an appropriate theory of relief under Rule 10b–5 in the absence of proof of scienter. The Third Circuit Court of Appeals defined aiding and abetting as follows:

" ... [T]he person who is primarily liable must have violated a securities law, and the alleged aider and abettor must have known of this violation and by his conduct substantially assisted ... the unlawful scheme.... "

*Rochez Brothers, Inc. v. Rhoades,* 527 F.2d 880, 886 (3rd Cir.1975).

■ The alleged aider and abettor must provide knowing and substantial assistance to the primary wrongdoer. *Woodward v. Metro Bank of Dallas,* 522 F.2d 84 (5th Cir.1975); *Landy v. Federal Deposit Insurance Corporation,* 486 F.2d 139 (3rd Cir. 1973); and *Securities and Exchange Commission v. Coffey,* 493 F.2d 1304 (6th Cir. 1974). *See also, Zabriskie v. Lewis, supra;* and *S.E.C. v. Bruce, supra.*

Therefore, the court concludes that it must overrule the motions for summary judgment of defendants Kennedy, Deem, Smith, Hoover, Hodges and Amyx because the court cannot conclude at this time as a matter of law that there are no triable issues of material fact.

#### 4.

#### Hart

Plaintiff has completely failed to state what evidence it has, if any, against Hart. The court has examined the record and finds that plaintiff's case against defendant Hart is based, at most, on the following admissions:

1. Switzer told Hart that "[h]e thought he had overheard or had some information that there was a possible buy-out or merger of Phoenix Resources and that if it came about, the stock should increase in value." Hart Transcript, p. 25.

2. Switzer told him that "[h]e had sat with or near somebody, and he had heard some information that made it sound like we ought to buy some stock." *Id.* at 60.

3. Switzer told him that "[h]e overheard or somebody recommended to him that it would be a good buy. I do not know what else. I was trying to think. I really do not remember whether he told me on Monday or Sunday. We probably talked on Sunday night before we left, and I do not remember talking to him about it. * * * It seems to me like he said that he had—no, I know. He had been to a track meet, his son's track meet, and he was sitting with somebody at the track meet. At the time the name did not mean anything to me, but I know now. I know who it was now because we visited about it. I know Barry has been up here, but it was a Mr. Platt who, I believe, works for Phoenix Resources. I do not know whether he overheard. Now, that part I do not know about. Like he said, he overheard him talking or it was just conversation, but I do not know exactly how it transpired. There is no way I could." *Id.* at 31.

4. Hart admits that, "[t]o the best of my recollection, he [Switzer] said he had overheard some information or some rumor or some talk that would lead him to believe that the stock was a good buy. * * * He had been to a track meet with his son, and he overheard the information or had some conversation. I do not know exactly what. I have really no idea exactly what was said, but whatever was said at this track meet. I do know that." *Id.* at 58.

Hart cannot remember whether or not Switzer told him that he had learned this information from a conversation with Platt, or whether he was told that Switzer overheard the information. Switzer, of course, will testify that he overheard the information and that it was not imparted to him in a face-to-face conversation with George Platt.

■ Even if the finder of fact were to infer from the evidence that Platt intentionally tipped Switzer, there is no evidence in the record to allow the finder of fact to infer that Switzer subsequently passed on to Hart anything but a bare recommenda-

tion to buy Phoenix. By the time the tip got to Hart, the record before us indicates only that the tip was vague as to source, was not specific as to why Phoenix was a good buy, and contained nothing of substance which would put Hart on notice that he should know that the information was confidential or that it came from an inside source. Where reasonable minds cannot differ as to a conclusion, summary judgment is appropriate. *E.g., TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 450, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976). *See also, Exnicious v. United States*, 563 F.2d 418, 424 (10th Cir.1977).

Plaintiff could prevail against Hart only if the finder of fact were allowed to infer from the evidence that Platt intentionally tipped Switzer and, without a scintilla of evidence, that Switzer revealed to Hart sufficient facts to show that the information was confidential and came from an inside source. The first inference may or may not be justified; we will await a trial on the issue. The second inference is totally without foundation on the record before the court.

This case, as well as the cases against Stay and Fischer, are similar in concept to *Dyer v. MacDougall*, 201 F.2d 265 (2nd Cir. 1952), where Judge Learned Hand affirmed summary judgment against the plaintiff in a slander case. In the record before him, the affidavits of all persons present when the slanderous statements allegedly were made denied plaintiff's allegations. Judge Hand wrote for the court:

"Hence, if the cause went to trial, the plaintiff would have no witnesses by whom he could prove the slanders alleged in the third and fourth counts, except the two defendants, Almirall and Mrs. Hope; and they would all deny that the slanders had been uttered. On such a showing how could he escape a directed verdict? It is true that the carriage, behavior, bearing, manner and appearance of a witness—in short, his 'demeanor'—is a part of the evidence. The words used are by no means all that we rely on in making up our minds about the truth of a ques-

tion that arises in our ordinary affairs, and it is abundantly settled that a jury is as little confined to them as we are. They may, and indeed they should, take into consideration the whole nexus of sense impressions which they get from a witness. This we have again and again declared, and have rested our affirmance of findings of fact of a judge, or of a jury, on the hypothesis that this part of the evidence may have turned the scale. Moreover, such evidence may satisfy the tribunal, not only that the witness' testimony is not true, but that the truth is the opposite of his story; for the denial of one, who has a motive to deny, may be uttered with such hesitation, discomfort, arrogance or defiance, as to give assurance that he is fabricating, and that, if he is, there is no alternative but to assume the truth of what he denies.

"Nevertheless, although it is therefore true that in strict theory a party having the affirmative might succeed in convincing a jury of the truth of his allegations in spite of the fact that all the witnesses denied them, *we think it plain that a verdict would nevertheless have to be directed against him.* This is owing to the fact that otherwise in such cases there could not be an effective appeal from the judge's disposition of a motion for a directed verdict. . . ." *Id.* at 268–69. (Emphasis supplied.)

In this case, as in *Dyer*, the plaintiff, who has the burden of proof, can only hope to prove its case by convincing the trier of fact of the truth of the allegations against Hart even though all the witnesses will deny these allegations. Even if the trier of fact concludes that Switzer got an intentional tip and that Hart is not being truthful about what Switzer told him, this would only serve to defeat Hart's defense. These conclusions would not be affirmative evidence to support plaintiff's case-in-chief. A directed verdict would have to be granted in Hart's favor. If this is true, then a motion for summary judgment should be granted before trial. *Sartor v. Arkansas Natural Gas Corp.*, 321 U.S. 620, 628, 64 S.Ct. 724, 729, 88 L.Ed. 967 (1944); *Nunez v.*

*Superior Oil Co.*, 572 F.2d 1119 (5th Cir. 1978); *Dyer v. MacDougall, supra.*

Hart can be further distinguished from the other defendants in that there is no evidence that he engaged in a partnership or joint venture for purposes of trading in Phoenix stock with Switzer. Thus, he should not be liable under an aiding and abetting theory. Therefore, defendant Hart's motion for summary judgment should be sustained.

### 5.

### *Stephen Platt*

Defendant Stephen Platt's motion for summary judgment, if it is such, consists of adopting the memorandum of law in support of the motion for summary judgment filed by defendants Switzer, Amyx, Hart, Hodges, Hoover and Smith. This memorandum, however, contains no discussion whatsoever of the facts surrounding Stephen Platt's alleged involvement in trading on inside tips. Therefore, the court overrules Stephen Platt's motion for summary judgment on the grounds that he has failed to "show that there is no genuine issue as to any material fact and that [he] is entitled to a judgment as a matter of law." F.R.C.P. 56(c).

### 6.

### *Stephen Stay*

■ The only evidence in the record against defendant Stay is that Hegberg told Stay "that I had bought some Phoenix because I thought something was going to happen." Hegberg Transcript, p. 100. Stay admits that Hegberg was excited by the company and "he told me that he had bought or was buying." Stay Transcript, p. 47. Stay thought there might be a merger involved, *id.*, but Hegberg did not answer his question about a merger either affirmatively or negatively.

There is absolutely no evidence before the court that Stay knew that Hegberg possessed inside information. Furthermore, there is no evidence that Hegberg, even if he had inside information, passed any on to Stay. The statement by an outsider that "there's something going on at Phoenix,"

that "I'm excited about Phoenix", or that "I'm buying Phoenix," does not raise the slightest inference that Stay, by hearing the statement, knew that he was hearing inside information, knew that it was confidential, or knew or should have known that it came from a corporate insider. *Chiarella, supra,* 445 U.S. at 230, n. 12, 100 S.Ct. at 1116, n. 12; 2 Bromberg & Lowenfels, *Securities Fraud & Commodities Fraud, supra.* Stay testified that he did not know that Hegberg had been talking to George Platt or Stephen Platt. If plaintiff has evidence to the contrary, it was not placed before the court as F.R.C.P. 56(e) requires. Therefore, the court will sustain defendant Stay's motion for summary judgment. *Dyer v. MacDougall, supra.*

### 7.

### *Arthur Fischer*

■ Defendant Fischer stands in a similar position as Stay. The uncontradicted evidence before the court shows only that Hegberg informed Fischer by telephone, in the course of a general conversation, that he was buying stock in Phoenix and that Fischer might want to do the same. There is no evidence in the record that Fischer knew of the proposed liquidation of Phoenix or of the imminent retention of an investment banking firm to evaluate such a proposal. There is no evidence that Hegberg gave any inside information to Fischer, and no evidence that Fischer knew it was confidential information or that he knew or should have known that the information came from a corporate insider. *Chiarella, supra,* 445 U.S. at 230, n. 12, 100 S.Ct. at 1116, n. 12. There is likewise no evidence that Fischer acted as an aider and abettor of a violation of § 10(b) and Rule 10b–5. Fischer's motion for summary judgment will therefore be sustained. Plaintiff's opposition to the summary judgment motion is little more than a bare assertion that Fischer is lying and a recitation of the pleadings. More is required of plaintiff by F.R.C.P. 56(e). *See also Dyer v. MacDougall, supra.*

## II

### THE RULE 12 MOTIONS

Defendants Switzer, Smith, Hodges, Amyx, Hoover and Hart have filed a joint motion to dismiss which adopts the motion to dismiss of Kennedy and Deem. Defendants Stephen and George Platt file a joint motion to dismiss which adopts by reference the joint motion to dismiss of defendants Kennedy and Deem. The parties all request the court to order plaintiff to file a more definite complaint. The court has considered the motions and finds they are without merit and should be overruled. In addition, the court will overrule the motions to dismiss of defendants Hart, Fischer and Stay because they are moot in light of the court's ruling on their respective summary judgment motions.

Defendants move to dismiss on the grounds that the complaint fails to assert and plead *specific facts* concerning the content of the alleged tips between the parties, and facts which would show that defendants knew the tips contained non-public information, and facts to show that defendants had positions of confidence or trust with Phoenix, and any facts which would show a breach of trust in trading on alleged inside information.

■■■ In considering a motion to dismiss, the factual allegations of a complaint must be taken as true; furthermore, all reasonable inferences must be indulged in favor of complainant. *Mitchell v. King,* 537 F.2d 385 (10th Cir.1976); *Dewell v. Lawson,* 489 F.2d 877 (10th Cir.1974). Pleadings are to be liberally construed. *Gas-A-Car, Inc. v. American Petrofina, Inc.,* 484 F.2d 1102 (10th Cir.1973). A complaint should not be dismissed for failure to state a claim unless it appears beyond a doubt that plaintiff can prove no set of facts in support of the claim which would entitle them to relief. *Kennedy v. Meacham,* 540 F.2d 1057 (10th Cir. 1976); *Jorgensen v. Meade Johnson Laboratories, Inc.,* 483 F.2d 237 (10th Cir.1973). Plaintiff's complaint should, therefore, be dismissed if, and only if, it appears beyond

a doubt that it can prove no set of facts which would entitle it to relief.

■■■ The pleaded facts have been well set forth in Part I, A of this memorandum. The court has considered the motions, but finds the complaint is sufficient in detail and in substance to withstand a motion to dismiss. The federal rules require only "a short plain statement of the claim showing that the pleader is entitled to relief." F.R. C.P. 8(a). The complaint complies with this rule. Evidentiary facts need not be pleaded in the complaint. *Dry Creek Lodge, Inc. v. United States,* 515 F.2d 926, 931 (10th Cir. 1975). "The test of adequacy of pleadings is whether the adversary has sufficient notice of the pleader's claim so that he can prepare his responsive pleadings or prepare for trial." *Riblet Tramway Company v. Monte Verde Corporation,* 453 F.2d 313, 318–19 (10th Cir.1972).

Defendants, however, argue that for purposes of pleading a claim under the Securities Act, F.R.C.P. 9(b) applies to allegations of fraud, and that conclusory allegations are insufficient to state a claim for a violation of § 10(b) or Rule 10b–5.

■■■ Federal Rule of Civil Procedure 9(b) states:

"... In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be avered generally."

The court notes at the outset that the rule only requires the complainant to set out the *circumstances* constituting fraud with particularity; the rule does not require the complainant to state the evidentiary facts constituting fraud with particularity.

■■■ Neither 15 U.S.C. § 78j(b) nor Rule 10b–5 contain any statement of standards to be applied or elements necessary in actions for civil liability under the Securities Exchange Act of 1934. *Reyos v. United States,* 431 F.2d 1337, 1347 (10th Cir.1970). However, for nearly twenty years the rule in this circuit has been that F.R.C.P. 9(b) does not apply to cases arising under

§ 10(b) or Rule 10b–5. *Stevens v. Vowell,* 343 F.2d 374, 379 at n. 3 (10th Cir.1965). Similarly, "[I]t is not necessary to allege or prove common law fraud to make out a case under the statute and rule." *Stevens v. Vowell, supra. See also Clegg v. Conk,* 507 F.2d 1351, 1354 (10th Cir.1974); *Hadsell v. Hoover,* 484 F.2d 123, 126 (10th Cir.1973); *Allen v. H.K. Porter Co.,* 452 F.2d 675, 678 (10th Cir.1971).

Defendants wish the court to require plaintiff to set forth in the complaint an exact quotation of the tips which allegedly passed from one defendant to another. This would go too far. The only persons who know what was said in June, 1981, are joined as defendants in this case. Plaintiff cannot read their minds. Plaintiff has done the best practicable under the circumstances by alleging the substance of the tip and when it was allegedly passed to each defendant. It would contravene the broad remedial policies behind the federal securities laws to dismiss the complaint for failure of the plaintiff to plead their evidentiary facts when neither the securities laws nor the case law require such specificity. The motions to dismiss will therefore be overruled.

### III

### CONCLUSION

The court concludes that the summary judgment motions of defendants Stay, Hart and Fischer should be granted for the reason that plaintiff has failed to set forth specific facts showing that there is a genuine issue for trial in regard to these defendants.

The court concludes that the summary judgment motions of Switzer and George Platt should be overruled on the grounds that there is an issue of material fact remaining as to whether or not an intentional tip was given Switzer by Platt on June 6, 1981.

The court concludes that the summary judgment motions of defendants Smith, Kennedy, Deem, Hoover, Hodges and Amyx should be overruled on the ground that there exist material questions of fact as to the extent of their knowledge of the inside source of the tip they received, and material fact questions exist in regard to their liability as aiders and abettors.

The court concludes that Stephen Platt's motion for summary judgment should be overruled because he failed to show that there were no genuine issues of fact and that he was entitled to judgment as a matter of law.

The motions to dismiss or for more definite statement of defendants Stay, Fischer and Hart will be overruled as moot in light of our ruling on their summary judgment motions.

The motions to dismiss of the remaining defendants are overruled because the complaint as it now stands is sufficient to place them on notice as to the allegations against them and are sufficient to enable them to prepare a response, if only a denial.

IT IS BY THE COURT THEREFORE ORDERED that the motions for summary judgment of defendants Stay, Fischer and Hart are hereby granted, and counsel for each of these defendants is directed to prepare and circulate journal entries of judgment and forward same to the court within twenty (20) days of this Memorandum and Order.

IT IS FURTHER ORDERED that the motions for summary judgment of George Platt, Stephen Platt, Barry Switzer, Lee Allen Smith, Sed Kennedy, Harold Deem, Robert Hoover, Jack Hodges and Robert Amyx are hereby denied.

IT IS FURTHER ORDERED that the motions to dismiss or for more definite statement of defendants Stay, Fischer and Hart are hereby overruled as moot in light of this Memorandum and Order.

IT IS FURTHER ORDERED that the motions to dismiss of defendants George Platt, Stephen Platt, Barry Switzer, Lee Allen Smith, Sed Kennedy, Harold Deem, Robert Hoover, Jack Hodges and Robert Amyx are hereby denied.